# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 17, 2013

## STATE OF TENNESSEE v. ALBERT C. SCOTT

### Appeal from the Criminal Court for Davidson County
### No. 2009-D-3422    Mark J. Fishburn, Judge

_____

### No. M2012-01137-CCA-R3-CD - Filed June 28, 2013

_____

A Davidson County jury convicted the Defendant, Albert C. Scott, of two counts of rape. The trial court merged the convictions and sentenced the Defendant to serve twelve months of incarceration, followed by nine years of probation. On appeal, the Defendant challenges the State's evidence against him, asserting that the State failed to prove the Defendant possessed the requisite *mens rea* for the crime. After a thorough review of the record and applicable law, we conclude there exists no error. We, therefore, affirm the trial court's judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Eugenia R. Grayer, Nashville, Tennessee, for the appellant, Albert C. Scott.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Rob McGuire, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

A Davidson County grand jury indicted the Defendant for two counts of rape: Count 1, sexual penetration without consent, and Count 2, sexual penetration by force or coercion. The parties presented the following evidence at the Defendant's trial: The victim testified that she met the Defendant through their mutual work at a McDonald's restaurant. She said that she and the Defendant were friends and had engaged in consensual sexual activity

before. The victim said that she was interested in pursuing a relationship with the Defendant, but the two were not in a committed relationship.

The victim testified that in the fall of 2007, the Defendant moved to Chicago, and the following March, he returned to Nashville for a visit. Upon his return, the victim contacted the Defendant at around 11:00 a.m. on March 26, 2008, to arrange to see him. The victim said that she was scheduled to be at work at 1:00 p.m. that day. The Defendant picked her up at her grandmother's house, where she resided, driving his friend's SUV. The victim knew the owner of the SUV, Michael Kirkwood, because he was the victim's manager at McDonald's. Due to the lateness of the Defendant's arrival, the victim told the Defendant that they would have to arrange to see each other later because she needed to get to work. The Defendant began driving the "regular" route to her work but took an earlier exit off of Ellington Parkway.

The victim testified that she asked the Defendant why he had taken the exit, and the Defendant told her he was taking a short-cut. The Defendant then told the victim that the SUV was "acting up." She said that the car was not making any noise but that the SUV "was like stop and go, stop and go." The Defendant pulled the car over to a stop and told the victim they needed to start walking. The Defendant led them to Kirkwood's residence, about a ten-minute walk from the SUV. The victim said she had been to Kirkwood's house before, and she expected Kirkwood's family to be present. When she and the Defendant entered the house, however, they were alone. The Defendant had told the victim that he was staying at a hotel with another person, but he had a key for entry to Kirkwood's home.

The victim testified that the Defendant retrieved a gas can and told the victim that he was going to "check on the car." The victim remained at Kirkwood's home, and the Defendant returned shortly thereafter. The victim said she was surprised by how quickly he returned. She said that, when she asked the Defendant what had been wrong with the car, he was "nonchalant" and did not give a full explanation.

The victim testified that she gathered her belongings and began walking to the door. The Defendant said, "Hey, where are you going?" and began flirting with the victim and trying to kiss her. The victim told the Defendant to "quit playing around" that she was late for work. She said that, initially, the Defendant's advances were "flirty," and the two engaged in a "cat and mouse game," with the Defendant chasing her around the coffee table. The victim recalled that the Defendant kept tugging at her clothing. At one point she stopped to straighten her clothing, and the Defendant's advances became more aggressive. He put his full weight against her pushing her back onto the couch. The victim had unzipped her pants to tuck in her shirt and the Defendant used this opportunity to pull her pants and underwear completely down. The victim said that she became upset when the Defendant

2

pulled her panties down, and her voice took on a more serious tone as she pled with the Defendant to stop. The victim continued to try to push the Defendant off her while trying to keep her clothes on. Her position against the couch, however, left her helpless. She said that she felt scared and attempted to convince the Defendant that they did not want to "have sex this way," and they could "do this" some other time. The Defendant responded that they could not have sex later because he was leaving town the following day. The victim recalled that she was "just making stuff up" to try to get the Defendant off her.

The victim testified that eventually she became physically tired from struggling against the Defendant and asked him to "at least" use a condom. She said she began "begging him" to use a condom because she "didn't see any other way out." The victim said that the Defendant then penetrated her vagina with his penis without using a condom, and she began crying. She recalled that the Defendant released her, backed away, and went to the bathroom. She said she slid off the couch feeling "deprived and nasty."

The victim testified that she pulled her clothes back on while the Defendant was in the bathroom. When he came out, she went into the bathroom and locked the door and became "hysterical." She said the Defendant kept asking her what was wrong, but she ignored him. When she came out of the bathroom, she demanded the Defendant take her to work immediately. She said that, at the time, she believed if she could just get to the McDonald's someone would help her. She explained that even though she had been to Kirkwood's house before, she was unsure of her exact location or how to get to the McDonald's restaurant from the house.

The victim testified that the Defendant drove her to the McDonald's, where she tried to take the car keys so he could not get away. She and the Defendant wrestled in the parking lot for the keys before she ran into the restaurant. She went directly to the back of the store and told Kirkwood, her manager and the Defendant's friend, that the Defendant had raped her. Kirkwood responded to her statement, saying, "Man, get out of here with that s**t," and walked away from the victim. The victim sat down and cried. She then approached another employee and said she needed to go home.

The victim said that one of the other managers drove her home, where she told her friend what had occurred. The victim's friend drove her to the police station to file a report. At some later point a detective, Heather Baltz, contacted the victim and asked the victim if she would participate in a controlled call with the Defendant. The victim agreed to the controlled call.

The victim testified that she felt like the "whole day" was a "trick." She said she believed the alternate route and the car trouble were all a "set-up" to get her to the house to

take advantage of her. The victim recalled that, as the Defendant drove her to McDonald's, she yelled at the Defendant for his actions, and he offered her a hundred dollars. The victim told him, "I don't want your money."

On cross-examination, the victim testified that, during the sex act, the Defendant did not discontinue when she began crying. She said that she "felt like he kept going until . . . he was ready to stop, until he was finished." The victim said she did not think the Defendant ejaculated. She agreed that she had thought the Defendant and she might "rendezvous," but when he did not arrive until around 12:15 p.m., she knew there was not enough time "to do anything" before she had to be at work. The victim agreed that she was willing to have a sexual relationship with the Defendant but not "then and there."

The victim testified that she and the Defendant kept in contact by phone and through My Space while he was in Chicago. The victim said that the Defendant was going to school in Nashville to "become a preacher." She said that she believed that the Defendant cared for her at the time. She said he gave her rides to and from work and tried to teach her to drive.

The victim testified that she called the Defendant several times after the incident, one of which was the controlled call. She agreed that she placed phone calls to the Defendant after Detective Baltz advised her not to call him.

Heather Baltz, a Metropolitan Nashville Police Department detective, testified that she was assigned to investigate the victim's rape allegation. She said that she suggested conducting a controlled call in this case because the victim and Defendant had a personal relationship and were on speaking terms prior to the incident. She said that controlled calls can be an effective investigative tool when gathering evidence in a rape case.

Detective Baltz testified that the victim used text messaging for the initial contact and the Defendant then called the victim. The phone call was recorded and lasted approximately eight minutes. The State then played the controlled call for the jury. During the phone call the victim told the Defendant she was mad at him and he apologized. She asked, "Why'd you have to do me like that?" To which the Defendant responded, "I said I'm sorry, damn!" Later in the conversation, the victim asked the Defendant "how you gonna make it up to me?," and she referenced an earlier conversation regarding money. The Defendant then detailed how he will send her the money. The victim told the Defendant that she had never "seen [him] like that before," and the Defendant responded, "I understand." The victim again reiterated her anger at his treatment of her, and the Defendant said that he was going to go to church and "repent."

Detective Baltz explained that, before a call was made, detectives discussed with the

4

victim the "approach" of the phone call. Detective Baltz went through this process with the victim and wrote the victim notes during the call suggesting questions or statements to make to the Defendant during the conversation. Detective Baltz said that the entire phone call was designed to elicit information for use in the investigation. Detective Baltz said that the Defendant apologized to the victim and never made any sort of categorical denial that he raped the victim during the recording.

Brenna Harris, a nurse practitioner, testified as an expert witness in the field of forensic sexual assault examination. Harris said that, at 7:00 p.m. on March 26, 2008, she performed a medical legal exam on the victim. During the examination, the victim told Harris that the Defendant was giving her a ride to work and made a stop at someone's house on the way. The victim said that the Defendant forced himself on the victim, and she repeatedly asked him to stop. When he would not respond to her, she asked him to put on a condom, but the Defendant penetrated the victim without the use of a condom. Harris said that she conducted a physical exam on the victim and provided her with prescriptions to treat sexually transmitted diseases. Harris described the victim as "tearful at times."

On cross-examination, Harris testified that the victim told Harris that the Defendant ejaculated inside the victim. On recross examination, Harris explained that the form she fills out during the interview portion of the exam had a question with boxes to mark the patient's responses. Next to the question, "Did the subject ejaculate?," there are three boxes for the answers, "yes," "no," and "unknown." Harris said that if a victim responded to the question by saying, "I think he did, but I'm not sure," she would mark the "yes" box to notify the lab to look for sperm. She said that she does this in an attempt to be more inclusive in the investigation. She did not, however, recall the victim's exact response to this question.

Dekonte Wreh testified that she knew the victim through their mutual employment at McDonald's. She said that she also knew the Defendant through the same job. Wreh recalled that the victim called her on the afternoon of March 26, 2008, upset and crying. Wreh said the victim's behavior was unusual for her and caused Wreh concern. Wreh immediately went to the victim's residence to see her. When Wreh arrived, the victim was still crying, and she told Wreh that the Defendant raped her. The victim told Wreh that the Defendant was supposed to take her to work but instead took her to a house and raped her. Wreh testified that she took the victim to the police station and was directed to the Criminal Justice Center located downtown.

The Defendant testified that he was twenty-six years old and attended American Baptist Theological Seminary in pursuit of a masters of divinity. He said that presently he was the assistant to the lead manager at a Target in Chicago, Illinois, and was applying to Malcolm X College in Chicago. The Defendant said that he and the victim had worked

together at a McDonald's. He described their relationship as "friends with benefits," explaining that he liked the victim but was not in love with her. The Defendant said that, at some point, the victim began to have more serious feelings for him than he had for her. He moved back to Chicago in September 2011 and the victim continued to contact the Defendant through My Space.

The Defendant testified that in March he returned to Nashville for a three-day lecture series. The victim learned of the trip through Kirkwood and sent the Defendant a message through My Space to confirm his arrival. When the Defendant arrived in Nashville, he called the victim but was unable to see her until Wednesday. He recalled that the victim called him and asked if he wanted to have sex. The Defendant said that he responded saying, "Whatever you want to do, it's fine with me. If you want to give me some, why not, sure." She asked the Defendant to pick her up and told him that she had to be at work at 1:00 p.m. The Defendant explained that he was supposed to be in "class," but he planned to leave early. He ended up being detained and called the victim to let her know he was on his way. The victim reminded him that she needed to be at work at 1:00 p.m.

The Defendant testified that he arrived at the victim's residence at around 12:15 p.m. The Defendant said that, at this point, he believed they were going to have sex at Kirkwood's house, where the Defendant stayed during his trip to Nashville. On the drive to Kirkwood's house, the car "poofed up." He said he thought the car was out of gas and, even though stalled, he guided the car off the interstate and to the side of the road. The Defendant and the victim walked the rest of the way to Kirkwood's house. He said that, once at the house, he asked the neighbor to help him go get gas. The neighbor agreed but needed ten or fifteen minutes before he could leave. The Defendant said that, while he waited for the neighbor to take him back to the car, he and the victim were kissing.

The Defendant testified that he and the neighbor went back to the car, and the neighbor was able to get the car running. The neighbor drove behind the Defendant back to Kirkwood's house. The Defendant said that he arrived back to Kirkwood's house at 12:45 p.m. He agreed that the victim told him "once or twice" she was going to be late for work, but he noted that she was not late for work "yet." He said that, when he and the victim first arrived at Kirkwood's house, the victim called in to work and told Kirkwood that she would be late due to car trouble. He said that, because Kirkwood knew the victim was with the Defendant, the victim's late arrival to work "wasn't no big thing with him."

The Defendant testified that he and the victim began "kissing and feeling and touching each other again." He agreed with the victim's testimony that the two began to chase each other around the coffee table. He said that, as they "play[ed] with each other," he touched the victim's breasts and vagina. The Defendant described the victim as "fine" with their

6

interaction at this point. He said the victim said, "Hee, hee, hee, stop playin', stop playin'," but no longer mentioned her need to be at work.

The Defendant described more intimate foreplay between the two that he characterized as consensual. He said the victim continued to say, "stop playing," but that was all. He said the victim unbuttoned her pants and then unbuttoned the Defendant's pants. The Defendant said that he unzipped and partially pulled down his pants and that then the victim asked if he had a condom. The Defendant told her he did not and asked if she had one. The Defendant said that he and the victim had engaged in unprotected sex before. The Defendant said that the victim did not tell him to stop or attempt to push him away and that her demeanor was the same as any other time the two had engaged in sex.

The Defendant testified that, after penetrating the victim, she turned her head away from him, began crying, and said, "you just want to use me and have sex with me." The Defendant said he was surprised by this statement, so he "backed up and stopped." The Defendant said that the victim did not tell him that she believed he raped her until the two were back in the SUV and driving toward the McDonald's. The Defendant said that he believed his interaction with the victim was consensual because, before he picked her up, the two had agreed they would have sex before the victim went to work. The Defendant said he believed the victim made the statement to him about his using her because "she began to catch feelings."

The Defendant testified that, when the victim was crying in the bathroom at Kirkwood's house, he stood at the door asking her what was wrong. He said the victim would not answer him, and he was "confused." He recalled that he and the victim got into the car and began driving to McDonald's. He said the victim was no longer crying and told him that she felt like he had raped her. The Defendant said that, upon hearing this, he "went off" on the victim saying, "What you mean [you] feel like I raped you? What I need to rape you for?" He said the victim's statement about rape "frustrated" him.

The Defendant testified that, once they arrived at the McDonald's, he and the victim began "playing" again by chasing one another around the car. The victim then told the Defendant she needed to go to work. He described the victim as laughing at this point. The Defendant said that later that same day, the victim called him. The Defendant explained that he and the victim had talked earlier about him giving her $235 for school. She called to ask him about the money, and he agreed to give her the money for school. The victim continued to call the Defendant after he returned to Chicago. During one of the conversations, the victim told the Defendant that a detective was trying to contact him.

The Defendant agreed that he apologized repeatedly to the victim during the

7

controlled call. He explained that he was apologizing to the victim for how she felt. He maintained that he did not rape the victim. The Defendant said that he told the victim during the controlled call that he was going to go to church and repent. He said that, when he said this, he meant that he was going to ask forgiveness for engaging in sex with the victim outside of wedlock.

On cross-examination, the Defendant testified that he and the victim were chasing each other, they "caught each other," and then backed toward the couch where the victim sat down. He said the victim unbuttoned her pants, and the Defendant pulled her pants and panties down. The Defendant said that when the victim began crying and told the Defendant to stop, he stopped. The Defendant said that the victim's statement about the Defendant's using her for sex did not cause him to stop on "that day or any other day."

Michael Kirkwood testified that he was a manager at the McDonald's restaurant. Kirkwood said that he knew the victim from her work at McDonald's and through the Defendant. Kirkwood described the victim and the Defendant's relations as "[s]ort of like a girlfriend/boyfriend." Kirkwood recalled that he loaned the Defendant his car while the Defendant was in town.

Kirkwood testified that, on the day of these events, he was at work and observed the victim arrive at work. He said the victim appeared "normal." Five to ten minutes after her arrival, the victim came into the office where Kirkwood was counting money and asked to speak with him. The victim told Kirkwood that the Defendant "tried to rape" her. Kirkwood said that he responded by saying, "Go on with that s**t," and he walked away.

Kirkwood testified that his drive from home to work is approximately five minutes. Kirkwood recalled that the victim called him around 12:30 or 12:45 p.m. that day to let him know that she would be late to work. Kirkwood said he was fine with her delay because he knew the victim was with the Defendant, and "it was cool." He then stated that the victim told him that she would not be coming to work.

Based upon this evidence, the jury convicted the Defendant of two counts of rape: Count 1, sexual penetration without consent and Count 2, sexual penetration by force or coercion. The trial court merged Count 2 into Count 1 and sentenced the Defendant to serve twelve months in the Tennessee Department of Correction, followed by nine years of probation. It is from this judgment that the Defendant now appeals.

## II. Analysis

The Defendant contends that the State provided insufficient evidence that he had the

required *mens rea*, intent, knowledge, or recklessness, for a jury to convict him of rape. The State responds that the proof supports the jury's finding of the Defendant's guilt beyond a reasonable doubt. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality

9

of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Tennessee Code Annotated section 39-13-503 (2010) defines rape as the unlawful sexual penetration of the victim, committed intentionally, knowingly, or recklessly, and accompanied by: (1) force or coercion; or (2) without the consent of the victim; or (2) the Defendant's knowledge or reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or (4) fraud. "Sexual penetration" is defined as, "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7) (2010).

The evidence, viewed in the light most favorable to the State, proves that the Defendant was to drive the victim to her work at 1:00 p.m. The Defendant arrived at the victim's residence at 12:15 p.m., and the Defendant drove toward the McDonald's where the victim worked. On the way, difficulties with the car caused the Defendant and the victim to leave the car on the roadside and walk to Kirkwood's nearby home. The Defendant then returned to the car with a neighbor to repair the car. He returned shortly thereafter with minimal explanation as to the repair of the car. The victim gathered her belongings to continue the drive to work, when the Defendant began chasing her in a playful manner. The victim described the interaction as flirty and playful, but she reminded the Defendant repeatedly of her need to be to work on time.

The playful interaction turned more aggressive as the Defendant pinned the victim against the couch and began inserting his hands into her clothing. The victim attempted to push the Defendant away and reason with him to "do this" another time, but to no avail. Feeling helpless, she begged the Defendant to use a condom. The Defendant ignored the victim's pleas and request for the use of a condom, penetrating the victim's vagina with his penis. The victim began crying and turned her head away. When the Defendant withdrew, he went to the bathroom, and, when he returned, the victim locked herself in the bathroom

and cried. The Defendant then drove the victim to work where the victim promptly sought help from a manager. When the manager refused to listen or to help the victim, she went home and contacted a friend, who aided the victim in reporting the incident. This is sufficient evidence upon which a jury could find beyond a reasonable doubt that the Defendant unlawfully penetrated the victim without her consent.

The Defendant specifically attacks the State's evidence of the *mens rea* requirement. For a rape conviction, the State must prove that the Defendant acted either intentionally, knowingly, or recklessly. T.C.A. § 39-11-301 (1)( c ) (2010); T.C.A. 39-13-503. The proof showed that the victim told the Defendant before he ever arrived to pick her up that she needed to be to work at 1:00 p.m. She again told the Defendant when he arrived that she needed to go to work. Once at Kirkwood's house, with the car in working order, the victim again told the Defendant, although in a more playful tone, she needed to get to work and that they would have to engage in sex "later." As the Defendant's advances became more aggressive, the victim's tone likewise became more serious as she pleaded with the Defendant to stop. The Defendant continued making sexual advances culminating in his penetration of the victim. In his brief, the Defendant essentially argues that his sexual penetration of the victim was consensual. We respectfully disagree. Because the victim at one time consented to sex with the Defendant or engaged in "flirty" behavior does not equate to consent by the victim at the time this rape occurred. The Defendant was provided with sufficient and repeated notice that the victim no longer consented to sexual intercourse with him to allow a jury to find him guilty beyond a reasonable doubt of rape.

Accordingly, we conclude that there was sufficient evidence for a jury to find beyond a reasonable doubt that the Defendant sexually penetrated the victim without her consent.

Additionally, sufficient evidence was presented to the jury to prove beyond a reasonable doubt that the victim was sexually penetrated as a result of force or coercion by the Defendant. The victim testified that the Defendant used his full weight to pin her against the couch, and that she struggled against the Defendant and tried unsuccessfully to push him off her while trying to keep her clothes on. The Defendant is not entitled to relief.

## III. Conclusion

After a thorough review of the record before this Court, we hold that the evidence is sufficient to sustain the Defendant's conviction. The judgment of the trial court is affirmed .

_____
ROBERT W. WEDEMEYER, JUDGE

11